Vito J. Titone, J.
In this article 78 proceeding, petitioner seeks a judgment inter alia to compel the respondents, Commissioner of the Department of Public Works of the City of New York, and Chairman of the Department’s License Board, to issue him a master electrician’s license.
In 1944, petitioner, at the age of 16, enlisted in the United States Merchant Marine. He served one year in the Mediterranean and Atlantic Theatres in World War II, and received an honorable discharge. In February, 1946, he enlisted in the American Army and served in the Pacific Theatre until he was honorably discharged in July, 1947. In September of the same year, he re-enlisted in the Army as a sergeant. He was separated from the Army in September of 1949 under circumstances which will be discussed more fully infra. In 1950, he again enlisted in the Merchant Marine, and served honorably until 1952.
Early in 1974, the petitioner filed .an application with the New York Civil Service Commission for a master electrician’s license. He was notified in February, 1974, that he had qualified in the written and practical examination. On April 16, 1974, petitioner appeared before the License Board for a hearing on his application. The Chairman, George E. Riley, questioned him about an arrest for third degree burglary in 1965 and his subsequent conviction the same year, on a plea of guilty to the reduced charge of criminally concealing and withholding property, a misdemeanor.
Riley, noting that petitioner’s fingerprint record had not yet been received, also questioned him as to whether he had ever been arrested at any time in the past other than the arrest for burglary in 1965. Schulman answered that he had been arrested only one time. At the end of the April 16th hearing, the board adopted a resolution recommending that the issuance of the license be approved subject inter alia to the receipt of petitioner’s fingerprints from the Police Department.
On April 17, 1974, the day following the hearing, petitioner telephoned Riley and informed him that he recalled an earlier incident while he was in the Army in 1947, which he did not *229 mention in the fingerprint application form, ostensibly because the form did not inquire into military incidents.
At the reopening of the hearing on June 11, 1974, petitioner, who is Jewish, related that after re-enlisting in the Army in September, 1947, at the age of 19, he was assigned to Europe. While there, he took guns and ammunitions and shipped them to Jewish people in the Near East, through France, in order to aid them in their fight to have the State of Palestine (later Israel) become a free and independent country. At the oral argument before this court, petitioner’s attorney stated, without opposition, that the guns and ammunition in question were captured from the Nazis during World War II.
Petitioner further stated at the continued hearing that he “become emotionally involved with people, and this emotion made me do things that * * * I believe was right. When I left the Army at that time they told me I should keep my mouth shut and they would keep their mouths shut and this wouldn’t show as any record towards me. They didn’t tell me it was a criminal offense or charge me at that time”. He further indicated that he was given a dishonorable discharge at the time. However, he also stated that he did not serve time in prison, but was . held in barracks for fear that the British government would find out that their troops were being killed with the guns that were being smuggled into the battle area in Palestine. Then, contradicting his previous statement about receiving a dishonorable discharge, the petitioner said that he "never received the discharge of the Government * * * I just walked and that’s it. I just said, 'I’ll go’ and that’s it.”
After the continued hearing was concluded, the board recommended to the commissioner that petitioner’s application for an electrician’s license be denied inter alia because of his failure to disclose all his criminal activities in his original application.
On October 1, 1974, still another hearing on the matter was held before the board. On this occasion, the petitioner was represented by an attorney. The attorney argued that the fingerprint record sheet (application) did not refer to matters of discipline in the military service, and that his client did not realize that military transgressions were to be included. He also stated that the information pertaining to the gun running operation was disclosed to the board before the police report on the military matter was received. (The fingerprint record *230 simply states that the petitioner was arrested in February, 1948, by the F.B.I. and, under the heading, "Date, Disposition, Judge and Court”, is the mere notation: "1 yr”.)
Also admitted in evidence with respect to petitioner’s military record, was correspondence between the attorney and various administrative officers of the Army. No information of significance was obtained from such correspondence. Attached to the petition is a postcard from the Office of the Under Secretary, Department of the Army, to the petitioner. It stated, inter alia, that the necessary record to answer his inquiry was probably among those lost in a fire in July, 1973.
The petitioner’s attorney also said that his client "says he never received a dishonorable discharge from the Government and * * * never actually spent any time in jail.”
On December 4, 1974, the commissioner sustained his earlier decision denying issuance of the license.
In its brief supporting the commissioner’s denial of issuance of a master electrician’s license to petitioner, the Corporation Counsel argues that the petitioner exhibited a lack of candor in failing to disclose on his application and at the April 16, 1974 hearing, of "the arrest and conviction which occurred during his Army service”. The court disagrees with such conclusion.
In his letter to the petitioner, dated June 13, 1974, the respondent commissioner stated that the record received from the Criminal Bureau of Investigation, New York City Police Department, indicated that he failed to disclose all criminal activities, and that he "had been found guilty of a federal offense and served time.” However, the minutes of the hearings on June 11, 1974, and October 1, 1974, do not support such assertion. No meaningful records were adduced at such hearings to controvert petitioner’s contention that he was never formally arrested for gun running in 1948, and that he never served time for the commission of a Federal offense. Indeed, the very absence of meaningful records, despite petitioner’s efforts to unearth them, lends strong credence to his claim that although this government strongly supported the creation of the State of Israel in the late 1940’s, gun running to aid the Israelis was a source of embarrassment to Federal authorities in Washington. It is significant that petitioner was first held incommunicado in his barracks, and then quietly released from the Army lest international repercussions ensue from the episode.
*231 The court is further of the opinion that petitioner’s action in bringing the matter to the board’s attention before the fingerprint record was received, strongly demonstrates that there was no deliberate intent to conceal or suppress the 1947 matter (cf. Matter of Farina v State Liq. Auth., 20 NY 2d 484). It should be noted that the incident in question occurred some 28 years ago, when the petitioner was 19 years of age. Passage of time invariably clouds the best of memories, and relegates events, important at the time of occurrence, to the limbo of shadowy and disassembled reminiscence.
Furthermore, the court does not believe it would be in the interest of justice to deny the petitioner the means of making a livelihood in his chosen profession because of actions taken by him in his youth to help create a spiritual homeland for all Jews, and a temporal haven for the many oppressed Jews, in the biblical land of Abraham and Isaiah. As poignantly expressed in the Irish poem, "The Exiles’ Return”:
"The alien home may have gems and gold. Sorrows may never have gloomed it. But the heart will sigh for the absent land. Where the lovelight first illum’ed it.”
Petitioner is approximately 46 years of age, married, and supports two children, and undoubtedly possesses the skills needed to qualify as a master electrician. At the present time, the policy of the Federal Government is moving toward the granting of amnesty to individuals who refused to serve in the Vietnam War, and encouraging their return into our society. Therefore, it seems incongruous that petitioner, who served this country honorably in the 1940’s against the onslaughts of a murderous and tyrannical demagogue and assassin of six million Jews, should now be denied the right to engage in his chosen profession because of some gossamery and undocumented incident which occurred in the distant past.
The court also wishes to voice its criticism with respect to the sparse and incomplete data furnished in this case by the Police Department with respect to petitioner’s role in the gun running episode in 1947, and the resulting disposition. An entry that an individual was arrested in 1947 for larceny and received "1 yr.”, is fragmentary, utterly worthless, and highly prejudicial. The court has discovered over the past few years, that computerized information about a defendant’s past record, unfortunately reveals little that can be relied upon. In this regard, the court believes that its position on this issue of computerized criminal records was succinctly set forth in the *232 following excerpts from the final report issued at the Annual Chief Justice Warren Conference on Advocacy in the United States, June 7-8, 1974, entitled "Privacy in a Free Society”:
"There are additional risks lurking in the ever-increasing reliance on recorded information and third-party evaluations of a person’s past performance. As information cumulates, the contents of an individual’s computerized dossier appear more and more impressive, despite the 'softness’ of much of the data, and impart to the user a heightened sense of reliability. Coupled with the myth of computer infallibility, this will make it less likely that an independent evaluation will be made or that the data will be verified. We are beginning to see more and more dependence on the files and the use of automatic criteria in the credit granting, insurance, education, and employment fields.
"I know a talented young lady who was unable to gain employment for some time following graduation from college because potential employers were wary of an entry in her university file that she became aware of only after many painful experiences. It said, 'Melinda’s mother is emotionally unstable.’ It turned out that this comment had been made by the girl’s sixth grade teacher, who was neither a psychiatrist nor a psychologist and had only met the child’s mother casually. Yet this damaging entry had been preserved and had followed Melinda for 15 years without anyone questioning either the propriety of its retention or its reliability or relevance.
"Thus, not suprisingly, many people have come to feel that their success or failure in life ultimately may turn on what other people put into their file and on an unknown programmer’s ability — or inability — to evaluate, process, and interrelate information. Moreover, as things now stand, a computerized file has a certain indelible quality — an old adversity or peccadillo cannot be overcome with time, absent an electronic eraser and a compassionate soul willing to use it.
* * *
"The problem of contextual accuracy is best illustrated in terms of one of the most dangerous types of personal information in our society — the unexplained and incomplete arrest record. A very large percentage of the arrest records maintained and disseminated by police agencies in the United States, including those in the computerized criminal justice information systems described earlier, show no disposition of *233 the charge following the arrest. For example, in Massachusetts, one out of five arrest records shows absolutely no subsequent judicial activity. How many more records contain entries relating to judicial activity but do not indicate the ultimate disposition of the proceeding — which might have been 'no prosecution,’ 'dismissed,’ 'innocent,’ or 'conviction reversed on appeal’ — has not yet been ascertained. In a nation supposedly committed to the proposition that an accused is innocent until proven guilty, the maintenance and disseminar tion of incomplete arrest records, often to an audience far larger than the law enforcement community and to people who occasionally have little or no legitimate right to see them, is intolerable given the adverse impact they can have on the lives of file subjects.
* * *
"Consider the potential effect of a computer entry 'arrested, criminal trespass; sentence, six months.’ Without elaboration how will the user know that our computerized person simply was demonstrating for equal employment in the North or desegration in the South in the 1950’s and was convicted under a statute that was overturned on appeal as an unconstitutional restraint on free speech, so that the subject is not a criminal at all? Will this individual be given the benefit of the presumption of innocence by the uninformed reader of the record?”
In sum, although this court is generally reluctant to disturb the exercise of discretion by an administrative agency or officer, it finds the alleged "concealment of petitioner’s unsubstantiated past arrest and conviction”, not to have been a false and material misrepresentation sufficient to warrant denial of a license to petitioner (cf. Matter of Wonderful Bar v Hostetter, 24 AD2d 1020).
Accordingly, the determination of the Commissioner of the Department of Public Works, denying petitioner a master electrician’s license is annulled, without costs; and the commissioner is directed to issue him such a license forthwith.